Allen, J.
The final decree allowed to the appellee Hagy certain offsets against the two bonds executed by him to Snead, for the pnrchase money of the 100 acres of land. The bonds were dated acording to the allega *419 tions of the bill, on the 26th and 27th of August 1839; and were assigned, one of them to Greenway & Co. and the other to L. Smith on the 29th of same month. Suits seem to have been brought by the assignees, immediately after the notes became payable. No defence was made to the action at law, and the office judgments being confirmed, the appellee during the same term of the court, obtained this injunction. It is contended on behalf of Snead’s assignees, that the offsets were legal, and should have been set up at law; that the appellee has shown no good reason for failing to rely upon them at law, and they should not therefore be allowed in equity. The principal offset was the note to Orr in which the appellee Hagy was a surety for Snead. It was past due when Hagy executed his bonds to Snead, but the debt had not then been arranged with Orr. Finding afterwards that he would be compelled to pay the debt, he settled with. Orr, and lifted the note on the 10th of January 1840. When his notes were assigned by Snead, Hagy had no claim to a legal offset against the notes. The setoff was merely equitable, and there might be some doubt whether by his own act in adjusting this debt, he could convert that, which at the date of the assignment was an equitable, into a legal offset, of which he could have availed himself at the trial at law. However that may be, it seems to me the case was proper for a court of equity on other grounds.
Hagy had made a contract with Snead for the purchase of a portion of a tract of land held in common by Ragsdale and Snead, and received from them a title bond dated the 3d of August. On the same day Hagy paid to Snead in cash, and transferred paper to him amounting together to 423 dollars 88 cents, and took from Snead his note in which it was stated that the amount thereof was to be discharged in land at 8 dollars per acre. The parties did not know at the time *420 the quantity of land which the boundaries described in the title bond would contain; and the substance of the arrangement was, that after deducting the price of the land sold when the quantity was ascertained, the residue of the sum of 423 dollars 88 cents was to be discharged in land at the same priee.
Before the quantity described in the title bond was ascertained, Hagy and Snead entered into another contract, whereby the former purchased of Snead the tract of one hundred acres, at 8 dollars per acre, and executed his two bonds for the sum of1 776 dollars of the purchase money: how the residue of the purchase money was adjusted, does not appear from the record. Before these bonds became due, difficulties arose as to the title of both tracts sold to Hagy. The land was part of a tract of two hundred and ninety acres, which had theretofore been purchased of Jacob Clark, one of the heirs of Benjamin Clark, by Benjamin Fulcher. In July 1839, Fulcher sold the land to Snead and Ragsdale for 3000 dollars, of which 1000 dollars was paid on the day the contract was completed, and the residue was to be paid in two installments, for which bonds were given; and a deed for the land was executed by Fulcher to Snead and Ragsdale, and placed in the hands of a third person, to be held as an escrow, and delivered upon the payment of the purchase money. Soon after the contract of purchase, there was some understanding or agreement, as appears by the answers of Snead and Ragsdale, by which Snead was to take the land and pay the purchase money; and it was no doubt after this understanding and whilst Snead exercised the control over the whole tract, that he undertook to sell off a portion to Hagy, and to put him in possession of the part so sold to him, although no partition had been made between Snead and Ragsdale. In his answer, Ragsdale avers that before their purchase from Fulcher, Snead had become largely in *421 debted to him, and that he did not begin to suspect Snead’s solvency, until some short time after the purchase. But that so soon as his fears about the stances of Snead were excited, he informed both Snead and Hagy that he would unite in no conveyance or sale of the land until he was made safe as well in reference to ‘the purchase money, as in relation to the individual debt of Snead; and that matters so stood until the 11th of November 1839, when they entered into the contract of that date filed with his answer; which recites that Ragsdale had purchased from Snead a tract of 150 acres of land, and Snead undertook to procure a good title to be made to Ragsdale, on the payment of 10 dollars per acre. The amount of Snead’s interest in this contract, Ragsdale alleges was to be credited on Snead’s private debt.
In consequence of these arrangements, it is insisted for Ragsdale, that he is entitled to the whole of 150 acres, and furthermore that he is also entitled to a moiety of the 100 acres sold by Snead to Hagy, under their joint purchase, as he had not united in the sale.
Besides the claim of Ragsdale to a moiety at least of the 100 acres, the tract in consideration of which the two bonds were executed, it appeared that a portion of the purchase money was still due to Fulcher, the vendor of Snead and Ragsdale; but the amount so in arrear was uncertain, and has only been ascertained upon the settlement of transactions between these parties, of an involved and complicated nature.
In addition to this, it was alleged that there was a considerable portion of the purchase money still unpaid by Fulcher to his vendor Jacob Clark. That the claim had been transferred to John M. Preston, who had instituted and was then prosecuting a suit in the County court of Washington county, to subject the land to the payment of this debt.
Such was the position of Hagy when sued upon the *422 bonds he had executed for the price of the 100 acres. The legal title was outstanding and his vendor could him no title. No partition had been made ^gp^gg^ gnea¿ an¿ Ragsdale, and the latter under the Pm'cbase, claimed a moiety of the land as his. There was an admitted balance of the purchase money due to the immediate vendor of Snead and Ragsdale. A claim was asserted and a suit was depending to subject the land to the payment of a debt alleged to be due to a more remote vendor; and Snead, it is averred in the bill, and appears to be admitted through:out the record, was at that time insolvent. Hagy was compelled to resort to a court of equity to ■ clear up the difficulties about the title; and that being his position, was it incumbent on him to set up his offsets in the action at law? The right to enjoin the payment of the purchase money where there is an incumbrance on the land purchased, is well settled. In Virginia, an injunction will be sustained after a conveyance, although there has been no actual eviction, but upon proof of a better title to the land in a third person. Ralston v. Miller, 3 Rand. 44.
There could be no doubt, therefore, if the bonds had remained in Snead’s hands, that a court of equity would have enjoined the payment until the difficulties about the title had been removed. It was uncertain, when the suits were instituted and the judgments confirmed, whether Hagy would get anything by his purchase. The alleged incumbrances for the purchase money covered the whole tract; and if the pretensions of Ragsdale were well founded, there would be little left for Hagy under his purchase from Snead. Though Snead might hold his bonds, which at law constituted a debt, it was still necessary to go into equity to ascertain whether in fact any debt existed. His bill, therefore, prayed that the contract of purchase should be rescinded, and his obligations- canceled in *423 the event of his being unable to get a good title to the land. _
_ In this state of uncertainty, it would have been proper to have relied on his offsets at law, for it would have been an admission that there was a valid debt against him to the extent of the offsets, whereas he owed nothing unless he could get the land. That was the principal controversy, and that could be settled in equity alone. When it was so settled, and a debt ascertained to be due, it would be proper to en-quire into the offsets. If the offsets had been offered and allowed at law, and it turned out that no title could be made, he would be driven to another action to recover the amount of the offsets for the failure of the consideration; and thus by requiring him to rely on his offsets at law, on the penalty of losing them entirely, he might be compelled to surrender bonds and securities constituting evidences of debt, and be driven to recover the money back in an action of assumpsit for the failure of the consideration. A portion of his offsets arose out of the contract in relation to the land itself. He had paid 423 dollars 88 cents on his first purchase. The land when surveyed, in the progress of this suit, was found to contain 43£ acres, amounting, -at 8 dollars per acre, to 348 dollars; leaving a balance, which, by the terms of their arrangement, was to be paid in land. This was an offset which could only be ascertained and fixed by a survey. Under every view of the case, it seems to me the court of chancery was the proper forum to decide upon the validity of the debt; to ascertain whether anything was due; and then as an incident to the principal subject of which it clearly had jurisdiction, and to avoid multiplicity of actions, to pass upon the offsets, no matter what was their character. But where, as in this case, a portion ■arose out of the contract of sale and purchase, and . another portion was an equitable offset at the date of *424 the note and the assignment, it would have been com-Patent for a court of equity to have allowed them, not relied upon at law. If Snead were the paiqy claiming the benefit of the judgments, I do not think he could be heard to make this objection: and unless Hágy has done something to waive his equity, as regards the assignees of Snead, they can occupy no higher position. It is not alleged or proved that they were induced to take the assignments in- consequence of any assurances from the obligor. They stand like all other assignees, and take the obligations assigned to them subject to all the equities which affected them in the hands of Snead. There is nothing whatever to distinguish their case from that of other bona fide assignees who have paid their money for that which turned out to be of little or no value. The obligor has been guilty of no laches in the assertion of his equity. Suit was instituted, and judgments recovered ■at the earliest possible period after the notes fell due. He interposed no delay, and at the first term after the notes became payable, filed his bill, convening all the parties to settle the difficulties about the title, and to ascertain whether anything would be due from him, and to distribute it amongst those entitled to it,- according to their rights. I think the court had jurisdiction to allow the offsets claimed by the appellee Hagy, and that there was no error in the decree directing an account of such offsets, and overruling the 1st, 2d and 3d exceptions of the assignees Gfreenways and Smith to the second report of M. C. Lynch, allowing some of said offsets. An objection was made in the argument here to allowing a credit for the sum of 423 dollars 88 cents, the full amount of cash and notes advanced and transferred to Snead at the time of the first purchase, because the bill suggests a doubt whether one of the notes so transferred, a note on Clevinger and Clarke for 90 dollars, had been made. The commissioner in *425 Ms report sets forth facts, which unexplained justified him in treating it as a payment to Snead; and as there was no exception to the report crediting Hagy with the 423 dollars 88 cents, it is too late to raise the objection here.
Nor do I think there was any error in so much of the decree as held that the appellee Hagy was entitled to a conveyance from Ragsdale, as well for the 100 acres for which he held Snead’s title bond as for the 43-2.- acres for which he held the title bond of both. The allegation in Ragsdale’s answer that when he became a party to the contract of the 3d of August 1839, by signing the title bond, it was agreed between Hagy, Snead and himself, that the contract of the 2Gth of August 1839 should be canceled, is an affirmative allegation, unsupported by proof. His pretension to claim the 150 acres in virtue of his contract with Snead of the 11th November 1839, and a moiety of the 100 acres as a joint purchaser with Snead, it appears to me is unfounded. It appears from the facts in the case, that Snead made the contract with Fulcher, and Ragsdale subsequently united with him in the purchase. It is alleged in the bill that when the appellee Hagy purchased, Snead seemed to be exercising exclusive control over the land purchased, and had placed him in possession, which he continued to hold without interruption. The answers of both Snead and Ragsdale admit that there was an understanding between them that Snead was to take the entire tract and pay the purchase money. It was during this arrangement that Snead sold a portion of the land to Hagy. One of the purchases was sanctioned by Rags-dale, by his uniting in the title bond, though the whole consideration had been paid to Snead. It furthermore appears from the report of the commissioner that Snead had advanced more of the purchase money to Fulcher than the value of the land sold by him to *426 Hagy. Under these circumstances, and if there had been no other arrangement between Snead and Rags-dale, the latter should not be permitted to disturb the sales made by his cotenant, sanctioned in part by himself, and made at a time when by his own agreement, the whole subject had been committed to the control of his cotenant; and when too, more than a moiety of the land remained undisposed of, exceeding in value the amount paid by him on the joint purchase. The agreement of the 11th November 1839, though somewhat obscure in its terms, when construed by the light of surrounding circumstances, so far from disaffirming, impliedly sanctions the sales made by Snead. Finding that Snead was unable to comply with the arrangement to take the whole tract and pay the purchase money, Ragsdale agreed to take what remained unsold upon the terms mentioned in the agreement. In consequence of the arrangement under which Snead had claimed the whole tract, the new agreement recited that Ragsdale had purchased the 150 acres from him, and made no allusion to their joint ownership under the purchase from Fulcher. The 150 acres was the residue after deducting the portion sold to Hagy. The court rightfully construed these transactions as being equivalent to an equitable partition, and properly held that the purchase should be apportioned between them according to the value of the lands held by each, taking Snead’s portion to be the land sold by him to Hagy. Nor do I think there was any error in overruling the 2d exception of the appellant Ragsdale to the first report of the commissioner. His first and third exceptions were in effect sustained by the decree of the 25th May 1847. Nor was there any error in overruling his exceptions to the second report of the commissioner, or in so much of the decree as ascertained that there was a balance of 219 dollars 61 cents due to Fulcher on account of the purchase money, *427 with interest from the 15th December 1840 until paid; and that Snead had overpaid the sum of 256 dollars 33 cents beyond his proportion of the purchase money. But it seems to me the Circuit court erred in holding that this surplus overpaid by Snead should enure to the benefit of Snead’s assignees, to compensate them in part for that portion of their debts which was lost by allowing Hagy’s offsets. The assignees had no lien on this fund; their notes were a lien on the land sold to. Hagy, but that lien did not attach to the land retained by Ragsdale. For the sum so overpaid, Snead would stand in the place of the vendor, and could subject Ragsdale’s portion; Tompkins v. Mitchell, 2 Rand. 428; but his assignment of Hagy’s bonds did not transfer this lien to his assignees. If a portion of the debts assigned be lost, the assignees stand like other general creditors, with no right to subject any specific fund of the assignor to their indemnity. In the present case, it appears from the admissions of Snead and the evidence in the record, that he was debtor on private account to Ragsdale in a much larger sum than the amount of purchase money overpaid by him. He cannot therefore require Ragsdale to pay the excess to him, or charge it on Ragsdale’s portion of the land if the latter chooses to give him credit for the amount on their private accounts. This is a matter for adjustment between themselves, and not involved in the present controversy. The appellee Hagy was only so far interested in the accounts between Snead and Rags-dale, as they related to the payment of the purchase money of the land sold to him; and when it was shown that Snead had paid so much of the purchase money as was equal in amount to the value of the land, he had established all that was necessary to his case. I think the court also erred ip. not charging the balance of the purchase money due to Fulcher on the 150 acres of the land held by Ragsdale, and in *428 omitting to decree a sale of it unless the money should be paid to the commissioner of the court within some limited time; as Hagy should not be delayed .in procuring his legal title by the omission of Ragsdale to pay the balance of the purchase money.
As to the suit by Preston to subject the land to the Ren of a remote vendor, the record does not disclose what disposition was made of it. This matter seems not to have been noticed farther in the progress of the cause by the parties or the court, and it has probably been determined against the validity of the claim, as was stated by the counsel.
The other judges concurred in the opinion of Allen, J.
The decree of the court is as follows:
The court is of opinion that the Circuit court erred in holding that the overpayment of the purchase money by the appellee Snead should enure to the benefit of Smith and of the Greenways, the assignees of the bonds executed to him by the appellee Hagy; and in decreeing that the appellant should pay the sum of 256 dollars 33 cents, with interest, to the commissioner of the court, to be apportioned between the assignees ratably. The assignees had no lien on that fund, and could not object to the same being applied by Snead to the payment of his individual debt to Ragsdale, or to prevent the latter from setting off the private debt due to him by Snead, against the amount aforesaid ascertained by the decree to have been overpaid by Snead. This was a matter to be adjusted between Snead and Ragsdale, their private accounts not being in issue in this controversy.
The court is further of opinion that as the appellee Hagy went into chancery to ascertain the amount of and to clear up the incumbrances, to the end that he, might obtain a title to the land purchased by him, the *429 court should have gone on and rendered a decree against the appellant for 219 dollars 16 cents, the balance of the purchase money due to Fulcher, with interest from the 15th December 1840 till paid; and unless paid within a prescribed period, the 150 acres of land belonging to Eagsdale should have been subjected to sale for the payment thereof, so that upon the payment of said incumbrance, the deed executed by Fulcher to Snead and Ragsdale could have been delivered for recordation, or a decree could have been entered for the execution of a new conveyance by Fulcher or a commissioner in his behalf to Snead and Ragsdale, if the deed delivered as an escrow at the time of the purchase could not be produced; and a decree also pronounced for a conveyance to the appellee Hagy, by Ragsdale and Snead, or by a commissioner in their names, for the 143& acres described in the title bonds made exhibits with the bill.
It is therefore adjudged and ordered that said decrees, so far as the same are herein declared to be erroneous, be reversed and annulled, and that in all other respects the said decrees be and the same are hereby affirmed. And it is further adjudged and ordered that the appellant recover of the appellees, except the appellee Hagy, his costs about his appeal; and it is further adjudged and ordered that the appellee Hagy recover of the appellant his costs by him about his defence here expended, he being the party substantially prevailing, so far as his interests were affected by said appeal. And this cause is remanded for further proceedings according to the principles aforesaid, in order to a final decree.